## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**TONIA MARIE SKINNER, ET AL.**

                           **CIVIL ACTION**

**VERSUS**

                           **NO. 19-66-JWD-EWD**

**JASON ARD, SHERIFF OF LIVINGSTON PARISH, ET AL.**

### RULING AND ORDER

      This matter comes before the Court on the *Re-Urged Motion to Dismiss Pursuant to Rule 12(b)(6)* (Doc. 22) filed by Defendant Deputy Barney McLin ("Deputy McLin").[1]  Plaintiffs Tonia Marie Skinner ("Ms. Skinner") and Gregory W. Causey ("Mr. Causey") (collectively, "Plaintiffs") oppose the motion. (Doc. 28.)  Deputy McLin has filed a reply. (Doc. 30.)  Oral argument is not necessary.  The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.  For the following reasons, Deputy McLin's motion is denied.

      In this case, a law enforcement officer attempts to insulate himself from the consequences of his actions through the protection of the qualified immunity doctrine, arguing that the Court cannot say, "beyond debate," that he should have known that his egregious conduct was unlawful. The victim in this case was a dog named Roscoe and the family that had loved him for six years.

      Deputy McLin arrived on Plaintiffs' property to serve a jury summons.  He wasn't investigating criminal conduct, hunting a suspect, or otherwise engaging in potentially dangerous duties.

---

[1] The other defendant in this case is Jason Ard, Sheriff of Livingston Parish, State of Louisiana.  Sheriff Ard has filed a separate *Re-Urged Motion to Dismiss Pursuant to Rule 12(b)(6)* (Doc. 21), which the Court will decide in a different ruling.

Roscoe was loose. Ms. Skinner warned Deputy McLin that Roscoe was loose. The deputy said he wasn't worried and proceeded anyway. The dog was not barking or aggressive.

Roscoe ran toward the officer, circled him, and "nipped" the back of the deputy's leg. "To nip" means to bite "lightly." In fact, the bite was so mild that it didn't tear the deputy's pants leg and caused only a scratch to his calf. In any event, after the "nip," Roscoe ran back toward Ms. Skinner.

Deputy McLin's response? Did he yell at the dog to go away? Did he reach for his baton or taser? Did he use his pepper spray?

No. Deputy McLin drew his fire arm and shot Roscoe twice in the side. The dog was seriously wounded. He could not stand, walk, run, or jump. Roscoe cried in pain. He crawled toward his owner. The officer fired two more shots at the dog and missed, all while the dog was near Ms. Skinner. Finally, Deputy McLin took steps *toward* the pet, aimed at his head, and fired a final shot which killed Roscoe.

Deputy McLin now claims qualified immunity. He argues that it cannot be said, beyond debate, that all reasonable officers would know that it was unlawful to kill a loose dog that had bitten an officer.

The Court disagrees. The Court finds every reasonable officer would know that it was unlawful to fire a final shot and execute a wounded animal that posed no threat. Accordingly, the motion is denied.

## I.    Relevant Factual and Procedural Background

### A.  Relevant Factual Background

The following facts are primarily taken from the *First Amended and Supplemental Complaint* ("*First Amended Complaint*"), Doc. 20.  They are assumed to be true for purposes of this motion. *Thompson v. City of Waco, Texas,* 764 F.3d 500, 502–03 (5th Cir. 2014).

Plaintiffs Ms. Skinner and Mr. Causey are married. (*First Amend. Compl.* ¶¶ 3–4, Doc. 20.) They are domiciled in Livingston Parish. (*Id.*)

At the time of the underlying events of this suit, Plaintiffs owned a six-year-old Weimaraner dog named Roscoe. (*Id.* ¶ 44.)  Roscoe had been a part of Plaintiffs' family for six years. (*Id.*)  The dog lived at Plaintiffs' home and was owned and cared for by them and their family. (*Id.* ¶ 45.)  "Roscoe was always confined to Plaintiffs' home and/or back yard and rarely left." (*Id.* ¶ 46.)

Defendant Deputy McLin is a Civil Processing Officer in the Livingston Parish Sheriff's Office. (*Id.* ¶ 10.)  His main responsibility is to serve civil summons on citizens of Livingston Parish. (*Id.*)

On the morning of February 1, 2018, Deputy McLin arrived at Plaintiffs' residence to serve Ms. Skinner with a jury summons. (*First. Amend. Compl.* ¶ 11, Doc. 20. )  Ms. Skinner saw Deputy McLin pull into her front yard, and she immediately went outside to notify him that Rosco had just been let out. (*Id.* ¶ 12.)  She asked Deputy McLin to wait by his unit so she could get Roscoe back into the house. (*Id.*)  Deputy McLin "told [Ms. Skinner] that he was not worried about the dog and proceeded directly towards [her] and further onto her property." (*Id.* ¶ 13.)  Thus, Deputy McLin "was not surprised or startled by Roscoe's presence." (*Id.* ¶ 48.)

"Roscoe then came from the back of the house and property and ran towards the area where [Ms. Skinner] and [Deputy McLin] were standing. . . . [] At no time did Roscoe bark, growl, show his teeth, or show any signs of aggression." (*First Amend. Compl.* ¶¶ 14–15, Doc. 20.)  As Roscoe was running toward the front of Plaintiffs' property, Deputy McLin "did not retreat, yell any loud, verbal commands, or reach for any weapons, including but not limited to his baton, pepper spray, taser, or gun, showing his lack of fear and/or apprehension of any threat." (*Id.* ¶ 16.)

Plaintiffs next allege that "Roscoe ran around the back side of [Deputy McLin] and, upon information and belief, nipped at his lower right rear calf area as Roscoe continued to run around [Deputy McLin]." (*Id.* ¶ 17.)  Deputy McLin's "injury" from this "nip" was "a scratch to his calf which was treated with an alcohol swab and a bandage. Upon information and belief, the pants leg of [his] uniform was not torn or scratched." (*Id.* ¶ 36.)

"Roscoe then immediately ran back toward [Ms. Skinner], who was reaching for Roscoe to bring him inside and was actively yelling commands at the dog." (*Id.* ¶ 18.)  Plaintiffs again claim that "Roscoe still did not bark, growl, show his teeth, or show any signs of aggression." (*Id.* ¶ 19.)

"Only after Rosco retreated from [Deputy McLin] and ran toward his owner, [Ms. Skinner], did [Deputy McLin] respond by pulling his personally owned weapon and shooting at Roscoe, hitting Roscoe twice in the side as Roscoe was running away from [Deputy McLin]." (*Id.* ¶ 20.) When Deputy McLin fired his gun, "Roscoe was within close proximity and physical distance of [Ms. Skinner], who was reaching for Roscoe to bring him back inside." (*Id.* ¶ 21.)

After Roscoe was "shot twice in his side as he ran away from" Deputy McLin, the dog was "still alive but was seriously wounded . . . and . . . unable to stand, walk, run, or jump." (*First Amend. Compl.* ¶ 22, Doc. 20.)  Roscoe was "[c]rying in pain and unable to stand[.]" (*Id.* ¶ 23.)

4

He "attempted to crawl on his side toward the house and [Ms. Skinner], while [she] continued to move closer to the dog who had frothy blood coming from his mouth and nose." (*Id.*)

Deputy McLin "then continued to shoot at Roscoe." (*Id.* ¶ 24.)  Deputy McLin "fired two more rounds as Roscoe crawled and retreated away, unable to stand seriously wounded, but the bullets missed the dog." (*Id.* ¶ 25.)  Ms. Skinner "was still within a close proximity and physical distance to Roscoe when [Deputy McLin] continued firing his weapon." (*Id.* ¶ 26.)  Then:

> While Roscoe was on his side unable to stand, walk, run, or jump, and was crying in pain and severely wounded, and clearly posed no danger or threat to anyone, [Deputy McLin] took a few steps directly toward Roscoe, stood over the dog, pointed his gun at Roscoe's head, and pulled the trigger, killing Roscoe with a single and final shot to the head.

(*Id.* ¶ 27.)

"At the time of the kill shot, Ms. Skinner was still in close proximity and physical distance to Roscoe." (*First. Amend. Compl.* ¶ 28, Doc. 20.)  Mr. Causey came upon the scene shortly thereafter and saw Roscoe, "dead on the ground, and his grief-stricken wife." (*Id.* ¶ 32.)

At no time did Deputy McLin ask Ms. Skinner to shoot or kill Roscoe, and at no time did she give Deputy McLin permission to shoot him or "put him 'out of his misery.' " (*Id.* ¶ 29.)  Additionally, she was "was never afforded the opportunity to protect Roscoe or bring him inside of her residence, and was not given the opportunity to render any aid to Roscoe after he was initially shot by [Deputy McLin], in spite of her attempt to forewarn [him] and avoid any conflict." (*Id.* ¶ 31.)  Further, Plaintiffs allege:

> Since [Deputy McLin] was alerted of the presence of Roscoe as he stepped out of his vehicle, since [Deputy McLin] was not startled by the presence of the dog, since [Deputy McLin] did not take any actions while Roscoe was running toward the front of the property where he and [Ms. Skinner] were standing, and because Roscoe did not bark, growl, show his teeth, or show any signs of aggression,

there was no justifiable cause for [Deputy McLin] to discharge his firearm or use deadly force upon Roscoe.

(*Id.* ¶ 33.)

Deputy McLin "was equipped with multiple non-lethal weapons as a part of his uniform . . . including but not limited to a baton, pepper spray, a taser, and handcuffs." (*First. Amend. Compl.* ¶ 34, Doc. 20.)   However, "[a]t no time prior to Roscoe running away from Deputy McLin" did the officer "attempt to use any non-lethal methods to restrain the dog, instead resorting to the most dangerous weapon he possessed – his personally owned gun – to shoot at the dog and in the vicinity of [Ms. Skinner]." (*Id.* ¶ 35.) Deputy McLin shot Roscoe "only after the dog had begun running away from [the deputy] towards [Ms. Skinner]." (*Id.* ¶ 35.)  Moreover:

> [Deputy McLin] had sufficient notice and time to avoid contact with Roscoe all together, or employ non-lethal methods to protect himself and/or restrain Roscoe, rather than killing him; including remaining in or near his vehicle or returning to his vehicle as [Ms. Skinner] initially advised; allowing [Ms. Skinner] to retrieve her dog and put him back in the house; or using loud, verbal commands, his baton, pepper spray, or taser. [Deputy McLin] neither attempted nor allowed any of these or other reasonable options prior to using lethal means.

(*Id.* ¶ 39.)  Further, the officer "was not conducting a criminal investigation with which Roscoe may have interfered, therefore he could have retreated to his vehicle as requested by [Ms. Skinner] without prejudice to any investigation or extensive delay in his daily duties." (*Id.* ¶ 49.)

Plaintiffs also allege, "[u]pon information and belief," that the deputy "has previously been involved in situations wherein he discharged his gun, killing a dog, while no person was in danger of severe physical harm." (*First Amend. Compl.* ¶ 40, Doc. 20.)  Plaintiffs uses this allegation to support their claim against Sheriff Ard. (*See id.* ¶ 41.)

Plaintiffs seek, *inter alia*, compensatory and punitive damages. (*Id.* ¶¶ 81–82.) Plaintiffs claim that they experienced property damage, veterinary expenses, and mental anguish from Roscoe's death and from being "within feet of the trajectory of [Deputy McLin's] fired weapons." (*Id.* ¶¶ 43, 53.)

Plaintiffs bring the following claims for relief: (1) illegal seizure under the Fourth Amendment against Deputy McLin and Sheriff Ard (*id.* ¶¶ 54–63); (2) state law conversion claim against Deputy McLin (*id.* ¶¶ 64–67); (3) state law *respondeat superior* claim against Sheriff Ard for Deputy McLin's actions (*id.* ¶¶ 68–72); and (4) state law claims for negligent hiring, training, and supervising (*id.* ¶¶ 73–77).

## B.  Procedural History

Plaintiffs filed their original complaint on February 1, 2019. (Doc. 1.)  On May 1, 2019, Deputy McLin and Sheriff Ard filed separate motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Docs. 5, 6.)

On February 10, 2020, this Court issued an order granting in part and denying in part Deputy McLin's motion. (*Ruling and Order*, Doc. 17 at 19.)[2] Specifically, the Court (1) dismissed Plaintiffs' claim under § 1983 and for medical and veterinary expenses without prejudice; (2) dismissed Plaintiffs' claim for *Lejune* damages with prejudice; and (3) denied the motion in all other respects. (*Id.*)  With respect to the § 1983 claim, the Court found:

> "It is objectively reasonable for an officer to shoot a dog that he reasonably believes poses a threat." *Romero v. Bexar Cty.*, 993 F. Supp. 2d 658, 662 (W.D. Tex. 2014) (citing *Altman v. City of High Point*, 330 F.3d 194, 206 (4th Cir. 2003)). However, courts applying

---

[2] Sheriff Ard's motion was also granted in part and denied in part. (*Ruling and Order*, Doc. 18.)  Specifically, the Court (1) denied the motion as to Plaintiffs' state law claim for *respondeat superior*; (2) dismissed with prejudice Plaintiffs' *respondeat superior* claim under § 1983; and (3) dismissed without prejudice Plaintiffs' other claims against Sheriff Ard. (*Id.* at 20.)  The Court gave Plaintiffs leave to amend to cure those claims dismissed without prejudice.

qualified immunity to officer involved shootings of dogs arrive at different conclusions. . . .

The factual allegations in the *Complaint* regarding Deputy McLin's action are troubling. Specifically, the *Complaint* alleges that Roscoe was retreating when Deputy McLin fired the second shots that killed him. (Doc. 1 at ¶¶ 17-18.) However, the factual allegations in the Complaint do not set out that Roscoe was in no way a potential threat when Deputy McLin fired the second shots. In addition, Deputy points out, the *Complaint* also provides conclusory allegations that "there was no justifiable cause for Deputy McLin to discharge his firearm or use deadly force upon Roscoe" and that "Deputy Mclin acted unreasonably under the circumstances." (Doc. 1 at ¶¶ 20 & 31.) This post-hoc rationalization that Deputy McLin "reasonably could have and should have employed non-lethal methods to restrain Roscoe, rather than killing him; or could have gone back to his vehicle as Ms. Skinner advised initially; or allowed Ms. Skinner to retrieve her dog and put him back in the house" does not overcome the qualified immunity in this case. For Plaintiffs to show that qualified immunity is not appropriate, they must set out specific facts showing the objective unreasonableness of Deputy McLin's actions, including that Roscoe did not pose a threat to Deputy McLin when he fired the shots that killed him. Therefore, the federal law claims for unreasonable seizure under the Fourth Amendment will be dismissed.

(*Id.* at 14–15.)  The Court gave Plaintiffs leave to amend their complaint to cure the deficiencies with respect to the claims under § 1983 and for medical and veterinary expenses. (*Id.* at 20.)

On March 9, 2020, Plaintiffs filed their *First Amended Complaint*. (Doc. 20.) On March 20, 2020, Deputy McLin filed the instant re-urged motion to dismiss under Rule 12(b)(6). (Doc. 22.)[3]

## II.    Rule 12(b)(6) Standard

"Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a

---

[3] Again, Sheriff Ard filed a separate re-urged motion to dismiss. (Doc. 21.)

complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 514 U.S. 10, 11, 135 S. Ct. 346, 346–47 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia*, *S.A. De* C.V., No. 10-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014).  The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted." *Id.* at 503.

### III.  Discussion

#### A.  Parties' Arguments

##### *1. Deputy McLin's Original Memorandum (Doc. 22-2)*

Deputy McLin argues that the *First Amended Complaint* fails to assert a viable claim against him under federal law because he is entitled to qualified immunity.  Deputy McLin maintains that, when the dog bit him, that was a clear act of aggression that justified the shooting.

Deputy McLin correctly recognizes that the killing of a dog can constitute a seizure under the Fourth Amendment.  He then asserts that, to analyze whether the seizure was reasonable, the Court must balance the nature and quality of the intrusion on the person's Fourth Amendment rights against the governmental interests at stake.  Deputy McLin states that this is done by analyzing the totality of circumstances generally and certain factors in particular, including whether the dog appeared aggressive, and courts have recognized that "an officer need not use the least harmful alternative in dealing with a dangerous situation." (Doc. 22-2 at 10 (citation omitted).)

Here, Plaintiffs fail to show that Deputy McLin's actions were unreasonable under the totality of the circumstances, as (1) the dog was running free on the property and was otherwise uncontained; (2) the dog had already ran at Deputy McLin, approached him from behind, and bit

his leg; and (3) the dog remained unrestrained after the biting.  The mere fact that Roscoe was not

showing signs of aggression before the shooting is irrelevant, as the dog had bitten the deputy, and

Plaintiffs' allegations that the dog was not aggressive are conclusory.

Ultimately, Plaintiffs have failed to provide any new facts that showed Deputy McLin acted

objectively unreasonable under the circumstances such that every reasonable officer would know

his conduct was unlawful.  Little has changed from the Court's prior ruling, as (1) "there is no

indication in the [*First Amended Complaint*] that Ms. Skinner was able to apprehend the dog, or

that the dog would not have approached and bit Deputy McLin once more," and (2) "the dog was

still running at large in the yard and near Deputy McLin, uncontrolled by Ms. Skinner despite her

alleged verbal commands and attempts to restrain him." (*Id.* at 12.)  Deputy McLin asserts:

> There are still no facts pled to show that every reasonable officer
> would have known that Deputy McLin's conduct violated the law.
> No facts are pled which would show that shooting a dog that
> displayed its aggression by biting the law enforcement officer and
> remained unrestrained was so unreasonable that every officer would
> have known that it violated the Plaintiffs' constitutional rights.
> Plaintiffs have pointed to no cases that make it "beyond debate" that
> it is objectively unreasonable for an officer to shoot an unrestrained
> dog which had previously bitten that officer. Without facts detailing
> this information, the Court cannot draw the conclusion that Deputy
> McLin is not entitled to qualified immunity.

(*Id.* at 13.)  Deputy McLin also emphasizes the high bar qualified immunity imposes.  Here,

according to Deputy McLin, it cannot be said "beyond debate" that his conduct violated the law

because "Plaintiffs' dog, despite not showing outward signs of aggression previously, is alleged to

have bitten Deputy McLin without warning, and remained unrestrained and uncontrolled." (Doc.

22-2 at 13.)  Plaintiff has failed to identify controlling precedent placing Deputy McLin on notice

that his conduct was objectively unreasonable. "The law simply does not require (and certainly

has not established by controlling precedent) that officers wait until a dog approached to bite a

second time before lethal force may be used." (*Id.*)  In closing, Deputy McLin urges that all federal claims be dismissed and that, because Plaintiffs have already been afforded one opportunity to cure the deficiencies, that the dismissal be with prejudice.

### 2. Plaintiffs' Opposition (Doc. 28)

Plaintiffs begin their argument by noting a number of cases which have recognized that the "killing of a companion animal is a seizure under the Fourth Amendment[.]" (Doc. 28 at 4.) Plaintiffs then contend that Deputy McLin's conduct was objectively unreasonable.  Plaintiffs largely recounts the details of the *First Amended Complaint* and then asserts that "Deputy McLin was **never** in immediate danger of *severe* bodily harm or death.  Especially at the time that he fired his gun, Deputy McLin was **not** in danger of severe bodily harm or death." (*Id*. at 5.)  Plaintiffs then emphasize the minor injury caused by the "nip." Plaintiffs close by arguing that Deputy McLin could have taken other measures without resorting to lethal force. (*Id.*)

### 3. Deputy McLin's Reply (Doc. 30)

Deputy McLin respond by reurging that "the dog had already bitten Deputy McLin and was still running at large, unrestrained by Ms. Skinner." (Doc. 30 at 2.)  According to Deputy McLin, "once the dog bit [him], it posed a threat, and he was reasonable, or, at the very least, was not objectively unreasonable, in shooting the dog." (*Id.*)  The law does not require that Deputy McLin use non-lethal force after being bitten.  Plaintiffs largely ignore the second prong of the qualified immunity analysis, as they fail to point to case law establishing "beyond debate" that Deputy McLin's conduct was unlawful.  Here, the officer "used deadly force against a dog that had already bitten him and which was not being controlled by Ms. Skinner." (*Id.* at 4.)  Deputy McLin argues:

> [U]nless case law establishes "beyond debate" that Deputy McLin was required to
> wait for the dog to charge him for a second time, or to cause more grievous harm

12

after a flagrant show of aggression, before he used deadly force, Plaintiffs cannot
establish that Deputy McLin is not entitled to qualified immunity.

(*Id.*)

## B.  Applicable Law

### 1. Qualified Immunity Generally

"Qualified immunity provides government officials performing discretionary functions
with a shield against civil damages liability, so long as their actions could reasonably have been
thought consistent with the rights they are alleged to have violated." *Gobert v. Caldwell*, 463 F.3d
339, 345 (5th Cir. 2006) (citing *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034 (1987)).
"In determining whether an official enjoys immunity, we ask (1) whether the plaintiff has
demonstrated a violation of a clearly established federal constitutional or statutory right and (2)
whether the official's actions violated that right to the extent that an objectively reasonable person
would have known." *Id*. (citing *Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508 (2002)).  Courts are
"permitted to exercise their sound discretion in deciding which of the two prongs of the qualified
immunity analysis should be addressed first in light of the circumstances in the particular case at
hand." *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808 (2009).

" 'Qualified immunity attaches when an official's conduct does not violate clearly
established statutory or constitutional rights of which a reasonable person would have known.' "
*Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct.
548, 551 (2017) (per curiam) (alterations and internal quotation marks omitted)). " 'Because the
focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is
judged against the backdrop of the law at the time of the conduct.' " *Id.* (quoting *Brosseau v.
Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596 (2004) (per curiam)).

13

"Although '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.' " *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotations omitted)). " 'In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law.' " *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotations omitted)).

" 'Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers.' " *Kisela*, 138 S. Ct. at 1153 (quoting *White*, 137 S. Ct. at 552 (internal quotation marks omitted)). "But . . . [a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.' " *Id.* (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).

Phrased another way, "[w]hen considering a defendant's entitlement to qualified immunity, [the Court] must ask whether the law so clearly and unambiguously prohibited his conduct that 'every reasonable official would understand that what he is doing violates [the law].' " *McLin v. Ard*, 866 F.3d 682, 695 (5th Cir. 2017) (citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *al-Kidd*, 563 U.S. at 741, 131 S. Ct. 2074)). " 'To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity.' " *Id.* (quoting *Morgan*, 659 F.3d at 371–72 (internal quotations omitted) (quoting *al-Kidd*, 563 U.S. at 742, 131 S. Ct. 2074)). " 'Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established.' " *Id.* (quoting *Morgan*, 659 F.3d at 372).

## 2. Fourth Amendment Seizures

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " *Grant v. City of Houston*, 625 F. App'x 670, 675 (5th Cir. 2015) (quoting U.S. Const. amend. IV). "A 'seizure' of property occurs when an officer meaningfully interferes 'with an individual's possessory interests in that property.' " *Id.* (quoting *Severance v. Patterson*, 566 F.3d 490, 501 (5th Cir.2009) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L.Ed.2d 85 (1984))). "The destruction of property constitutes a meaningful interference with an individual's possessory interests." *Id.* (citing *Jacobsen*, 466 U.S. at 124–25, 104 S. Ct. 1652). "It is beyond dispute" that the killing of an individual's pet dog by an officer constitutes a "seizure" "within the meaning of the Fourth Amendment." *See id.* (citing *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir.2005) (" 'The killing of [a] dog is a destruction recognized as a seizure under the Fourth Amendment' and can constitute a cognizable claim under § 1983." (alteration in original) (quoting *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds by Robinson v. Solano Cnty.*, 278 F.3d 1007, 1013 (9th Cir. 2002)))).

"Seizures by law-enforcement officials violate the Fourth Amendment only if they are unreasonable." *Id.* (citing *Plumhoff v. Rickard*, —— U.S. ——, 134 S. Ct. 2012, 2020, 188 L.Ed.2d 1056 (2014) ("A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard."). "To determine whether a seizure was reasonable, we look to the totality of the circumstances, balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' " *Id.* (quoting *Plumhoff*, 134 S. Ct. at 2020 (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

*Grant* was another case involving the killing of a dog by police officers.  The Fifth Circuit found no error in the district court's granting of summary judgment to the defendants. *Id.* at 676. In doing so, the appellate court weighed the "grave intrusion on [the owner's] property rights" but found that the "governmental interest of safety provide[d] a sound justification" for the officers' conduct. *Id.* (citations omitted).

*Grant* provides guidance to this Court with respect to how to evaluate these Fourth Amendment claims.  The Fifth Circuit "examine[s] an officer's use of deadly force from

> the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." We thus "allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."

*Grant*, 625 F. App'x at 677 (quoting *Plumhoff*, 134 S.Ct. 2012, 2020, 188 L.Ed.2d 1056 (2014) (alteration in original) (citation omitted) (quoting *Graham*, 490 U.S. at 396–97, 109 S. Ct. 1865)). Factors which *Grant* considered include whether the officer had "advanced notice that a dog was present on the premises" or were otherwise surprised by the dog," whether the officer took "reasonable precautions" to deal with the dog, whether the officer had "exhausted all non-lethal options prior to using lethal force against the dog." *See id.* at 675–76 (relying on *Hells Angels*, 402 F.3d at 975–78). The Fifth Circuit has also looked at whether the dog was "aggressive," whether it was "retreating or fleeing from the officer" or "in fact running towards . . . the officer at the time the lethal shot was fired," and whether the dog had "aggressive tendencies" or was "aggressively barking prior to the shots being fired." *See id* at 677.  Still other factors include whether the officer was "imminently in danger of being bitten by [the dog] at the time [the officer] discharged his weapon" and whether the animal was shot from behind. *See id.* at 677–78.  Again, the key question is reasonableness based on the totality of the circumstances. *Id.* at 675.

16

### 3. Qualified Immunity with Fourth Amendment Seizures

Considering all of this, "[i]t is objectively reasonable for an officer to shoot a dog that he reasonably believes poses a threat." *Romero v. Bexar Cty.*, 993 F. Supp. 2d 658, 662 (W.D. Tex. 2014) (citing *Altman v. City of High Point, N.C.*, 330 F.3d 194, 206 (4th Cir. 2003)).  For example, in *Romero*, the court granted summary judgment for an officer because "he had reason to believe that [the plaintiff] was armed and dangerous"; because, upon approaching a house, "several large dogs ran out aggressively charging, barking and growling"; and because he "acted in self-defense when he shot the dog." *Id.* at 661–62.

Similarly, in *Stephenson v. McClelland*, 632 F. App'x 177 (5th Cir. 2015), the Fifth Circuit found that the plaintiffs failed to provide sufficient evidence to show that a reasonable officer in the defendant's shoes would know his conduct violated a clearly established right.  *Id.* at 185.  The appellate court based this decision on the following facts: (1) the officer "did not know there would be a dog present during his encounter with [the suspect] and was surprised by its presence"; (2) the officer did not know the family pet was "friendly and nonaggressive"; and (3) the officer "was startled by a large dog that was showing its teeth (whether baring them aggressively or 'smiling')." *Id.*  The Fifth Circuit concluded that the officer "was forced to make a split-second judgment in a tense situation and he acted to protect himself." *Id.*

Conversely, in *Kincheloe v. Caudle*, No. 09-010, 2009 WL 3381047 (W.D. Tex. Oct. 16, 2009), *report and recommendation adopted,* No. 09-010, 2009 WL 10699745 (W.D. Tex. Dec. 7, 2009), the magistrate judge recommended that summary judgment be denied because, according to the plaintiffs' version of events, the dog Buddy "did not pose an immediate danger to the public or [the chief] when [the chief] decided to draw his weapon and shoot and kill Buddy." *Kincheloe*, 2009 WL 3381047, at *8.   According to the plaintiffs, the dog had been on the plaintiffs' front

17

porch, and the chief had been in the street standing in front of his patrol car. *Id.* Buddy had "beg[u]n to walk slowly toward some bushes in the front yard" when "Chief Caudle drew his gun and fired two shots at Buddy, killing him." *Id.* Plaintiffs had denied "that Buddy charged Chief Caudle or acted aggressively in any manner." *Id.* The magistrate judge concluded:

> Based upon Plaintiffs' allegations, Chief Caudle was not faced with exigent circumstances[, *see., e.g., Altman*, 330 F.3d at 206 (finding that killing of dogs was reasonable where officer was charged by a pack of five dogs that had already attacked persons in the neighborhood and another officer)] that necessitated the killing of the dog. If the facts asserted by the Plaintiffs are found to be true, the Court finds that a reasonable officer in Chief Caudle's position would have known that the killing of the Kincheloes' dog at the Kincheloes' residence was unlawful. . . . *See* [*Vilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008)] (holding that fact issues precluded summary judgment on qualified immunity defense where plaintiffs alleged that officer shot their pet dog multiple times after the dog no longer posed a threat); [*Andrews v. City of West Branch*, 454 F.3d 914, 918–19 (8th Cir. 2006)] (finding that officer was not entitled to qualified immunity where facts showed that police chief knew at the time he shot pet dog in enclosed yard that he was violating dog owner's clearly established Fourth Amendment rights); [*Brown v. Muhlenberg Twp.*, 269 F.3d 205, 209, 211-212 (3d Cir. 2001)] (finding that there were material fact issues which precluded summary judgment for officer on Fourth Amendment claim where plaintiffs alleged "officer intentionally and repeatedly shot a pet without any provocation and with knowledge that it belonged to the family who lived in the adjacent house and available to take custody."); *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled on other grounds, by Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (finding that fact issues precluded summary judgment where plaintiffs alleged that police officers walked onto plaintiffs' front lawn and fired shots at dog after the dog had stood up and denied that dog had charged officer). *See also, San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 978 (9th Cir. 2005) (denying summary judgment on qualified immunity grounds after finding that "[a] reasonable officer should have known that to create a plan to enter the perimeter of a person's property, knowing all the while about the presence of dogs on the property, without considering a method for subduing the dogs besides killing them, would violate the Fourth Amendment.").

*Id.* at *8 & n.5. The district court adopted this part of the magistrate judge's report and recommendation and allowed the Fourth Amendment seizure claim to proceed. *Id.*, 2009 WL 10699745, at *5–6.

Thus, as reflected in *Kincheloe*, other "circuits have invariably concluded that 'the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable.'" *Robinson v. Pezzat*, 818 F.3d 1, 7–8 (D.C. Cir. 2016) (quoting *Viilo*, 547 F.3d at 710, and citing *Hells Angels*, 402 F.3d at 975–78 (holding that the killing of guard dogs was unreasonable under the Fourth Amendment where "the officers were not presented with exigent circumstances that necessitated killing the dogs"); *Brown*, 269 F.3d at 210–11 ("[T]he state's interest in protecting life and property may be implicated when there is reason to believe the pet poses an imminent danger. In the latter case, the state's interest may even justify the extreme intrusion occasioned by the destruction of the pet in the owner's presence. This does not mean, however, that the state may, consistent with the Fourth Amendment, destroy a pet when it poses no immediate danger and the owner is looking on, obviously desirous of retaining custody." (footnotes omitted)); *see also Bletz v. Corrie*, 974 F.3d 306, 310 (3d Cir. 2020) ("we hold that the use of deadly force against a household pet is reasonable if the pet poses an imminent threat to the law enforcement officer's safety, viewed from the perspective of an objectively reasonable officer." (citing *Brown*, 269 F.3d at 210–11; *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 568 (6th Cir. 2016) ("[A] police officer's use of deadly force against a dog while executing a warrant to search a home for illegal drug activity is reasonable under the Fourth Amendment when, given the totality of the circumstances and viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety.")).

*4. Analysis*

Having carefully considered the matter, the Court will deny Deputy McLin's motion.  The Court first finds that Plaintiffs have sufficiently pled a Fourth Amendment violation.  That is, the Court finds that, viewing the totality of the circumstances, the operative complaint, on its face, contains enough factual matter that, when taken as true, raises a reasonable hope or expectation that discovery will reveal relevant evidence of each element of Plaintiffs' federal claims.  *See Lormand,* 565 F.3d at 257.

While Defendants maintain that Roscoe was loose and "nipped" Deputy McLin's calf, they ignore the factors which the Fifth Circuit looked to in *Grant*, almost all of which weigh in favor of Plaintiffs.  Specifically, Deputy McLin had "advanced notice that a dog was present on the premises" and was otherwise unsurprised by the dog, *see Grant*, 625 F. App'x at 675–76; *First Amend. Compl.* ¶ 12–13, 48, Doc. 20.  The deputy failed to take any "reasonable precautions" to deal with the dog (and in fact proceeded toward the house after being warned the dog was loose while saying he was "not worried about the dog," *see Grant*, 625 F. App'x at 675–76; *First Amend. Compl.* ¶ 12–13, 48, Doc. 20.  Deputy McLin also failed to exhaust any non-lethal options prior to using lethal force, *see Grant*, 625 F. App'x at 675–76; *First. Amend. Compl.* ¶¶ 20–27, 35, Doc. 20.

Further, Roscoe was not aggressive but only "nipped" (that is, "bit or pinch[ed] . . . *lightly*") the officer in a way that caused virtually no injuries—only a scratch and no torn pants or ripped pants leg, *see Grant*, 625 F. App'x at 677; *First. Amend. Compl.* ¶¶ 17, 36, Doc. 20; Merriam-Webster, *nip*, https://www.merriam-webster.com/dictionary/nip .  Roscoe was "retreating [and] fleeing from the officer . . . at the time the lethal shot[s] [were] fired," *see Grant*, 625 F. App'x at 677; *First Amend. Compl.* ¶¶ 18–20, 23, 24–25, Doc. 20).  Roscoe was also not "aggressively

barking prior to the shots being fired," *see Grant*, 625 F. App'x at 677, as, indeed, the dog was in no way barking, growling, showing his teeth, or showing any signs of aggression, *First. Amend. Compl.* ¶¶ 14–15, 18–19, Doc. 20.

Perhaps most importantly, Deputy McLin was not "*imminently* in danger of being bitten by [the dog] *at the time [the officer] discharged his weapon*," *see Grant*, 625 F. App'x at 675–78. Critically, Roscoe was running away from the officer at the time he was initially shot. *First Amend. Compl.* ¶¶ 18–19, Doc. 20.  After Roscoe was shot, he was crawling away from Deputy McLin, wounded and "unable to stand, walk, run, or jump. (*Id.* ¶¶ 20, 22–23.)  Roscoe "clearly posed no danger or threat to anyone" when Deputy McLin "took a few steps directly toward Roscoe, stood over the dog, pointed his gun at Roscoe's head, and pulled the trigger, killing Roscoe with a single and final shot to the head." (*Id.* ¶ 27.)

Considering the totality of the circumstances, the Court finds that Plaintiffs have clearly alleged a Fourth Amendment violation.  *See Jones v. Lopez*, 689 F. App'x 337 (5th Cir. 2017) (per curiam) ("agree[ing] with the legal ruling that the killing of the plaintiffs' pet dog raise[d] a Fourth Amendment claim" when plaintiffs claimed that "[t]hey never saw him threaten to attack the officers, heard him growl, or otherwise pose the threat identified by the officers" and when they claimed the dog was retreating from the officers); *Kincheloe*, 2009 WL 3381047, at *8.

Second, the Court finds that Deputy McLin is not entitled to qualified immunity.  Again, "[i]t is objectively reasonable for an officer to shoot a dog that he reasonably believes poses a threat." *Romero*, 993 F. Supp. 2d at 662.  Deputy McLin's only argument is that, when Deputy McLin fired the first two shots which wounded Roscoe, the dog was loose and had bitten him in the leg.  But, considering the minor nature of the scratch and the fact that Roscoe was running

*away* from the officer, McLin could not have reasonably believed Roscoe posed a threat at that point.

Even if a reasonable officer in Deputy McLin's shoes could have believed that Roscoe posed a threat when he first shot Roscoe in the side, the *First Amended Complaint* makes clear that, after those initial shots, Roscoe was "still alive but was seriously wounded . . . and . . . unable to stand, walk, run, or jump." (*Id.* ¶ 22.)  Roscoe was retreating from the officer, as he "attempted to crawl on his side toward the house and [Ms. Skinner]." (*Id.* ¶¶ 23, 25.)  Then:

> While Roscoe was on his side unable to stand, walk, run, or jump, and was crying in pain and severely wounded, and clearly posed no danger or threat to anyone, [Deputy McLin] took a few steps directly toward Roscoe, stood over the dog, pointed his gun at Roscoe's head, and pulled the trigger, killing Roscoe with a single and final shot to the head.

(*Id.* ¶ 27.)  In sum, at the time the final shot was fired, Roscoe did not pose a threat, and every reasonable officer would know that killing the dog when he was no longer a threat was objectively unreasonable and plainly incompetent. *See Kincheloe*, 2009 WL 3381047, at *8 n.5 (collecting extensive persuasive authority that killing dog that was not a threat is objectively unreasonable).

This case is a far cry from *Grant, Stephenson*, and *Romero*.  Unlike *Stephenson*, Deputy McLin knew the dog was present during the encounter and was otherwise not surprised, and the dog was not aggressive or showing his teeth *at the time of the shooting*. *Stephenson*, 632 F. App'x at 185.  Rather, Roscoe was running back toward his owner.  Further, unlike *Romero*, there was no reason to believe that Plaintiffs were "armed and dangerous," and Roscoe did not "r[u]n out aggressively charging, barking and growling." *Romero*, 993 F. Supp. 2d at 662  Moreover, at the time Roscoe was shot in the head, he unquestionably no longer posed a threat, and Deputy McLin was not acting in self-defense.  Lastly, as demonstrated above, nearly all of the factors *Grant* considered weigh in favor of a constitutional violation.

*Kincheloe* cites *Viollo*, and the Court finds this Seventh Circuit case directly on point. There, officers received an anonymous tip that a wanted felon had entered the plaintiffs' home accompanied by a pit bull. *Viollo*, 547 F.3d at 708–09. As six officers approached the house, the family dog Bubba ran toward the officers and, according to them, growled and exposed his teeth (though a neighbor testified the dog came out to greet them). *Id.* at 709. One officer fired two shots at the dog, at least one of which shots hit the dog and caused a bone fracture in his front leg. *Id.* The dog retreated to the bushes near the front window of the house and remained hidden for ten minutes. *Id.* Officers refused to let the owners retrieve the dog or call a veterinarian. *Id.* One officer then approached the bush, which prompted the dog to emerge and head toward the gangway leading to the back yard. *Id.* Multiple witnesses testified that "Bubba was limping and whimpering as he emerged from the bushes and that he was just trying to get back to" the plaintiffs. *Id.* A witness testified that the dog was moving slowly and just sat down when an officer "came out . . . from the front . . . And he lowered his shotgun[.]" *Id.* An officer fired that shotgun a third and fourth time and killed Bubba. *Id.*

The Seventh Circuit began, "Although this is not, to say the least, a record that paints a sympathetic picture of the defendants' actions on the night Bubba was killed, the defendants nonetheless argue that they are entitled to qualified immunity as a matter of law." *Id.* The officers argued that the killing was justified (1) because of "the risk that Bubba might interfere with their investigation;" and (2) because it was not clearly established at the time that this seizure was a Fourth Amendment violation. *Id.* at 710.

The Seventh Circuit rejected both arguments. The appellate court explained:

>   This first argument is obviously and vigorously contested. Despite the police testimony, at least seven witnesses testified that Bubba wasn't interfering with the officers when he was shot for the third and fourth time. Rather, according to the witnesses, he was

> attempting to limp back to his owner. It should go without saying
> that this testimony, if it is credited by the jury, does not support the
> conclusion that the decision to shoot Bubba a third and fourth time
> was reasonable.

*Id.* As to the second argument, the court looked to persuasive authority which "clearly establish

that it is unreasonable for officers to kill a person's pet unnecessarily" but found that "these

decisions are not essential to reaching this conclusion." *Id.* The Seventh Circuit then stated:

> "[T]he very action in question [need not have] previously been held
> unlawful" for a public official to have reasonable notice of the
> illegality of some action. *Anderson v. Creighton*, 483 U.S. 635, 640,
> 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987). In 2001, we held that
> domestic animals are "effects" within the meaning of the Fourth
> Amendment. *See* [*Siebert v. Severino*, 256 F.3d 648, 656 (7th Cir.
> 2001).] The *Siebert* decision is enough to give police officers
> reasonable notice that unnecessarily killing a person's pet offends
> the Fourth Amendment.

*Id.* at 710–11.

The same reasoning applies here with even greater force. Unlike *Villo*, where the police

had received an anonymous tip that a wanted felon had entered the plaintiffs' home with a pit bull,

547 F.3d at 708–09, here, Deputy McLin was merely serving a jury summons, so there was no

suspected criminal activity or danger. Additionally, like *Villo*, at the time of the fatal shot, Roscoe

was wounded and "attempting to limb back to his owner." *Id.* at 709. Further, the "robust

consensus of persuasive authority" highlighted by *Kincheloe* and exemplified by *Villo* clearly

establish that the killing of a pet dog which the officer does not reasonably believe is a threat is

objectively unreasonable.

In any event, as in *Villo*, reliance on persuasive authority is not essential, as *Grant*

recognizes that "[i]t is beyond dispute that the killing of an individual's pet dog by an officer

constitutes a 'seizure' within the meaning of the Fourth Amendment" and that "[s]eizures by law-

enforcement officials violate the Fourth Amendment . . . if they are unreasonable." *Grant*, 625 F.

App'x at 675.  Certainly, it was fair notice that it was objectively unreasonable to execute Roscoe when he was seriously wounded; when he could not stand, walk, run, or jump; when he was retreating from the officer; and when Deputy McLin had to take "a few steps directly toward" the pet to finish Roscoe by firing the kill shot into his head.

For all these reasons, Deputy McLin is not entitled to qualified immunity.  His motion is denied.

### IV.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Re-Urged Motion to Dismiss Pursuant to Rule 12(b)(6)* (Doc. 22) filed by Defendant Deputy Barney McLin is **DENIED.**

Signed in Baton Rouge, Louisiana, on <u>February 3, 2021</u>.

 

 

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**